Michael J. Healy *et al.*

*v.*

The People of the State of Illinois.

*Filed at Ottawa November 9, 1896.*

1. Evidence—*statements of person mortally wounded—when admissible as res gestæ.* A statement of a person mortally wounded by officers from whom he was escaping, that he did no wrong, though not a dying declaration, is admissible against such officers as part of the *res gestæ,* when made in their presence and hearing.

2. Appeals and Errors—*when abstract instructions are reversible error.* A conviction will be reversed for abstract instructions which tend to mislead the jury to the injury of the defendant.

3. Same—*when instructions not applicable to the facts constitute reversible error.* Instructions as to self-defense and justifiable homicide in the killing of a person endeavoring to commit a felony or to offer personal violence to another in his house, constitute reversible error on the trial of officers for killing a person attempting to escape from them after arrest, in which such questions do not arise.

4. Instructions—*as to impeachment of witness by contradictory statements—when not proper.* An instruction that the credibility of a witness may be impeached by statements out of court contrary to his testimony, and that if the jury believe that any witness has made such contradictory statements they tend to impeach him, and the jury would be justified in rejecting his testimony if, from all the evidence, they believe it to be untrue, is properly refused.

Writ of Error to the Criminal Court of Cook county; the Hon. O. H. Horton, Judge, presiding.

John C. King, and John W. Byam, for plaintiffs in error:

Dying declarations are such as are made by the party relating to the facts of the injury of which he afterward dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately. 1 Phillips on Evidence, 235; Roscoe on Crim. Evidence, 29-31; 2 Starkie on Evidence, 262; 1 Chitty on Crim. Law, 569; 2 Russell on Crimes, 683, 684; 1 Greenleaf on Evidence, 156, 158; *Montgomery* v. *State,* 9 Humph. 17; *Rex* v. *Van Butchell,* 3 C. & P. 495; *Nelson* v. *State,* 7 Humph. 583;

*Hill's case,* 2 Gratt. 608; *Campbell* v. *State,* 11 Ga. 374; *People* v. *Knickerbocker,* 1 Park. Cr. 306; *People* v. *Green,* id. 11.

Dying declarations are admissible only in cases of homicide, where the death of the deceased is the subject of the charge and the circumstances of the death are the subject of such declarations. *Reynolds* v. *State,* 68 Ala. 502; *Johnson* v. *State,* 50 id. 456; *Hudson* v. *State,* 3 Coldw. 355; *Lieber* v. *Commonwealth,* 9 Bush, 13; *Wooten* v. *Wilkins,* 39 Ga. 223; *State* v. *Medlicott,* 9 Kan. 257; *Marshall* v. *Railroad Co.* 48 Ill. 475; *Barnett* v. *People,* 54 id. 325; *State* v. *Harper,* 35 Ohio St. 78; *Hackett* v. *People,* 54 Barb. 370; 50 N. Y. 95.

Dying declarations are restricted to the identification of the prisoner and the deceased, and to the act of killing, and the circumstances immediately attending said act and forming part of the *res gestœ.*   *State* v. *Vansant,* 80 Mo. 67; *State* v. *Draper,* 65 id. 335; *Collins* v. *Commonwealth,* 12 Bush, 271; *State* v. *Word,* 53 Vt. 560.

Only such statements are admissible as relate to what actually transpires, who were the actors, to the position of persons, what was said by the parties, what were the instruments used, who used them and how, and like matters.   *Savage* v. *State,* 18 Fla. 909; *Jones* v. *State,* 71 Ind. 66; *State* v. *Vansant,* 80 Mo. 67; *Sylvester* v. *State,* 71 Ala. 17; *Greer* v. *State,* 66 id. 40; *State* v. *Smith,* 49 Conn. 376; *People* v. *Grunzig,* 2 Edm. Select Cas. 236; *Moeck* v. *People,* 100 Ill. 242; *Montgomery* v. *State,* 80 Ind. 338.

Matters of opinion contained in a dying declaration are not admissible.   Wharton on Crim. Evidence, sec. 294.

It is well settled that dying declarations must speak the facts only, and not mere matters of opinion.   Roscoe on Crim. Evidence, 32; Wharton on Crim. Evidence, sec. 294; *Warren* v. *State,* 35 Am. Rep. 745.

MAURICE T. MOLONEY, Attorney General, (T. J. SCOFIELD and M. L. NEWELL, of counsel,) for the People:

The rule is well established as to the admissibility of dying declarations in the following cases: *Scott* v. *People,*

63 Ill. 511; *Barnett* v. *People,* 54 id. 329; *Starkey* v. *People,* 17 id. 17; *State* v. *Baldwin,* 79 Iowa, 714; *State* v. *Nash,* 7 id. 347; *People* v. *Lee,* 17 Cal. 76.

The fact that the deceased was conscious of impending death may be gathered from the circumstances of the case, the nature of the injury and state of the body, and from expressions used by him. Taylor on Med. Jur. 33, 34; *Starkey* v. *People,* 17 Ill. 17; *State* v. *Nash,* 7 Iowa, 347; *Kilpatrick* v. *Commonwealth,* 7 Casey, 198; *People* v. *Ybarra,* 17 Cal. 166; *Commonwealth* v. *Roberts,* 108 Mass. 301; *State* v. *Gillick,* 7 Iowa, 287.

The statements made by the deceased form a part of the *res gestœ* in the case. The rule as to their admissibility on this ground is laid down in the following cases: *Railway Co.* v. *Becker,* 128 Ill. 545; *Lander* v. *People,* 104 id. 248; *Insurance Co.* v *Mosley,* 8 Wall. 397; *Paryear* v. *Commonwealth,* 83 Va. 51; *People* v. *Vernon,* 35 Cal. 49; *Commonwealth* v. *McPike,* 3 Cush. 181; *Elkins* v. *McKean,* 79 Pa. St. 493; *State* v. *Baldwin,* 79 Iowa, 704; *State* v. *Schmidt,* 73 id. 469; *State* v. *Driscoll,* 72 id. 583; *Commonwealth* v. *Hackett,* 2 Allen, 136; *Driscoll* v. *People,* 47 Mich. 413; 1 Greenleaf on Evidence, sec. 108; *Simons* v. *People,* 150 Ill. 66.

Mr. JUSTICE CARTER delivered the opinion of the court:

At the January term, 1895, of the Criminal Court of Cook county, the plaintiffs in error, Michael J. Healy and Thomas J. Moran, who had been jointly indicted for the murder of Swan Nelson, were convicted of manslaughter and sentenced to the penitentiary for a period of fourteen years each. At the time of the homicide, which occurred about three o'clock in the morning of the 25th day of December, 1893, the plaintiffs in error were policemen of the city of Chicago and were engaged in the performance of their duties as such officers. Their beats were adjacent to each other, and after twelve o'clock at night, in obedience to the commands of their superior officer, they were accustomed "to double up and travel their beats to-

gether." At No. 3217 Archer avenue, upon one of these
beats, was a saloon kept by one Nothelfer. Swan Nel-
son, the deceased, was unmarried, and lived and kept a
small cigar store at 3205 Archer avenue, and in a house
in the rear of his premises, and on the same lot, lived
Otto Bjorkman and his wife, Josephine Bjorkman, and
one Shay, who boarded with the Bjorkmans. Nelson,
Shay and several other friends of the Bjorkmans had
spent the evening of December 24, and up to a late hour
(about two o'clock) in the morning of the 25th, at the
latters' house, passing the time in conversation, social
amusement and beer drinking. Nelson left Bjorkman's
house about two o'clock Christmas morning. Bjorkman
himself had retired to bed at half-past one and was not
awakened until after five o'clock, and knew nothing of
the circumstances of the tragedy in which Nelson lost
his life. Where Nelson went immediately after leaving
the Bjorkmans is not disclosed by the evidence, but some
time between two and three o'clock,—there being some
difference in the testimony of the witnesses as to the pre-
cise time,—Nelson entered Nothelfer's saloon. A half
dozen or more men who testified as witnesses on the trial
had spent the night, up to the time of the tragedy, in the
saloon, drinking and in such pastime as the place af-
forded. Some of these were asleep or intoxicated, and
were apparently unable to give a very clear account of
what occurred in the saloon, but according to the sub-
stance of the testimony as given by them, excepting that
of Martin Wickert, which corroborated the version given
of the affair by the plaintiffs in error, they, the plaintiffs
in error, came into the saloon with Nelson and Nelson
treated them, one of them taking a cigar and the other a
glass of beer; that while they were standing at the bar
Nelson took a pencil and piece of paper and seemed to
be taking down the numbers of the policemen's stars;
that the policemen went out, and soon after one of them,
Healy, came back and took Nelson by the shoulder and

pushed him out of the saloon, and soon after some of the persons in the saloon, hearing a noise on the outside, went out at the front door and saw plaintiffs in error have Nelson under arrest and taking him along the sidewalk, when, after proceeding from one hundred to one hundred and fifty feet, Nelson appeared to lie down and refuse to go, whereupon one of the officers went to the patrol box, leaving Nelson in charge of the other, when Nelson sprang to his feet and ran to the east along Archer avenue. He was pursued by the two officers, both of whom commenced firing their pistols in the direction of the fleeing man, who about that time disappeared in the darkness down the steps at 3205 Archer avenue, where it was afterward learned he lived, and which was about five feet below the level of the street. The officers returned without being able at that time to re-arrest or find Nelson. Soon thereafter Mrs. Bjorkman appeared on the outside of her residence with a lantern in her hand and was heard to call some one, who, upon going where she was, found Nelson lying under the steps at or near her house. On being taken out from under the steps he was found to be wounded and his clothes were bloody. He was removed to the street by Healy and Caspar Saeler, the bar-tender at the saloon, and laid upon the sidewalk, where he remained some minutes surrounded by a number of persons who, attracted by the affair, came up and remained until he, Nelson, was taken away by the patrol wagon to the Deering street station, from whence he was afterward taken to the hospital, where he died that day. The post-mortem examination showed that a bullet had entered his back, about six inches above the lower end and a little to the left of the spinal column, ranging slightly upward, and had penetrated the body through the stomach and intestines and had lodged under the skin of the abdomen. The bullet was slightly flattened at one end, as if it had struck some hard substance and been deflected from its course. It was what was called

a 38-caliber short, and weighed 122.6 grains. One witness testified as an expert that it was a deflected bullet but had lost no material part of its substance; that a bullet 38-caliber short, fired from Colt's 38-caliber revolver, would be sufficiently strong to pass through two human bodies at the distance plaintiffs in error were from Nelson when the shots were fired. The pistols used by plaintiffs in error were Colt's revolvers, 38-caliber, and adapted to 38-caliber long cartridges, the bullets of which weighed from 150 to 152 grains, and plaintiffs in error testified that they had and used no other kind of cartridges than the 38-caliber long.

There is a material conflict in the testimony as to what occurred at Nothelfer's saloon relative to the question as to whether the arrest of Nelson by plaintiffs in error was a lawful or an unlawful arrest, and as to what was said by plaintiffs in error when Nelson lay mortally wounded, first at the steps at Mrs. Bjorkman's, and next on the sidewalk after having been brought out upon the street. Plaintiffs in error testified that about twenty-five minutes past the hour of three o'clock of the morning in question they were walking west on Archer avenue, and as they came to Nothelfer's saloon they saw a man whom they did not know apparently peeping in at the window over the inside blind; that Healy asked him what he was doing there, and he replied, "It is all right; I am looking in to see if this man is open," and stepped up to the door and asked them to come in and have something; that Healy said no, and the man who, after he was shot, they learned was Nelson, went inside; that when they saw the man looking in, the lamp in the saloon was turned about half-way down; that they walked fifty or sixty feet west of the saloon, talked the matter over and returned to the saloon to order the proprietor to close up, as it was after hours; that they went inside, and Nelson and the bar-tender and Wickert were at or near the bar, and the rest of the inmates, five or more,

were asleep about the room in or upon chairs; that the bar-tender had a box of cigars in his hand and passed them to plaintiffs in error, who each took one; that they did not take a drink with Nelson or have any conversation with him in the saloon, and did not know him except that they saw he was the same man they had seen looking in from the outside; that they did not see him have any paper or pencil or take or attempt to take their numbers, and did not either of them push Nelson out of the saloon or have anything to do with him in the saloon whatever, but that after being in the saloon but a moment they went out, saw the proprietor on the outside, sick, at the water trough, and told him they would have to report him for being open after hours, and that Healy informed him about the man looking in over his curtains and said it looked suspicious; that they then went west to Wood street to the patrol box and made their report to headquarters, as they were required to do every hour; that they then went east on Archer avenue, and when they again came near the saloon they saw two men fighting on the sidewalk in front; that they stepped up quickly and Healy ordered the men to go home; that one of them, who had no coat or hat on, turned and went away, but the other called Healy a vile name and said, "You couldn't run anybody in," and followed the remark by a blow with a "billy" or something of that kind, which knocked Healy down upon the street, off of the sidewalk; that thereupon Moran took hold of the man, who proved to be Nelson, placed him under arrest, and in the struggle pushed him against the saloon building and held him there until Healy, who had lain for a moment unconscious from the blow, regained his feet, whereupon they, one on each side of Nelson, took him and started up the street with him; that after proceeding a short distance Nelson "laid down on them," and they being unwilling to carry him, let him lie down upon the sidewalk, Healy standing by watching him while Moran went to the patrol box to

call the patrol wagon; that upon Moran's return he went into the middle of the street to be ready to stop the wagon when it should come up, and while there Nelson sprang to his feet and ran to the east. Healy testified that when Moran went into the middle of the street, he, Healy, took out his handkerchief to wipe the blood from his face that flowed from the wound made upon his head when Nelson knocked him down, and that while he was wiping his face Nelson made his escape. Healy and Moran ran after Nelson, and they admitted that they fired their revolvers as testified by other witnesses, but testified that they had no intention of shooting Nelson, but endeavored to fire at an angle in the air and to frighten him into obedience to their commands to halt, so they might re-capture him; that they fired but two shots each; that they had arrested Nelson for knocking Healy down, and for nothing else.

As to what occurred at the saloon, plaintiffs in error were corroborated to a considerable extent by the witness Wickert, who was called by the People, and testified that Nelson came into the saloon alone and that the officers came in from three to five minutes afterward, and Nelson asked them to drink with him; that they took something—thought it was cigars—and Nelson paid for it; that the officers went out; that he did not see Nelson have any pencil or paper taking their numbers; that he did not know how Nelson got out, but later he heard a noise on the outside and went out and saw Healy lying upon the ground about twenty-two feet from the door of the saloon and Moran holding Nelson; that Healy got up, and he and Moran started away with Nelson.

Caspar Saeler, the bar-tender, in his testimony for the People, contradicted the version of the affair as given by plaintiffs in error and Wickert in some material respects, but either from ignorance or from intoxication or inattention at the time of the trouble, or some other cause, his testimony was greatly deficient in clearness

and certainty. On his direct examination he testified that Healy took Nelson out of the saloon and that Moran was outside, and that the officers there "licked Nelson with clubs," and that Nelson cried out and the officers then took him away to where he lay down on the street; but he afterward testified that he did not see any blows struck and did not go outside until Wickert and others went out, and that the first thing he saw was Nelson lying down on the sidewalk, some eighty to one hundred feet from the saloon. This witness had testified at the coroner's inquest, and from the testimony of the coroner, which was given on the trial for the defense, tending to impeach Saeler, his testimony was materially different as given on the two occasions. Other witnesses testified as to certain statements made by Healy and Moran, and also by Nelson when he lay mortally wounded, and within a few minutes after the shooting. One witness testified that Healy said that Nelson shoved him off the sidewalk and he shot him; that Healy said that Nelson hit him a good whack on the head. Another witness testified that one of the officers said, "We shot him," and that Nelson said, "Have I no friends here? Gentlemen, I am dying. I did no wrong." And Mrs. Bjorkman, that Nelson said when Healy was taking him from under the steps, in reply to her question as to what he had done, that he did nothing at all,—that he treated the policemen in the saloon, and when he didn't want to treat them any more they shot him. These several statements, however, were contradicted, to a considerable extent, by several witnesses besides the plaintiffs in error, and need not be further referred to here, except in connection with the contention of counsel that the trial court erred in admitting as evidence to the jury the said statements of Nelson. We are of the opinion that no error in this regard was committed. While Nelson was then mortally wounded and seemed fully conscious of the fact, yet even under such circumstances he could only testify to the facts and

circumstances of the killing, and would not be permitted, any more than any other witness, to testify to his own mere conclusion that he "did no wrong." That was one of the questions at issue before the jury involved in the lawfulness of his arrest, and we are of the opinion that it was not admissible as a dying declaration, but that it was admissible against the defendants, in whose presence and hearing it was made, and as a part of the *res gestœ*, as held by the learned judge in the trial court.

Plaintiffs in error did not know who the man was whom they testified they saw fighting with Nelson in front of the saloon, nor was any evidence offered tending to corroborate their statements in regard to such fight, or tending to identify the man who, as they said, left and went east on Archer avenue without coat or hat on, except that a Mr. and Mrs. Bergan, living near the Bjorkmans, testified that they were awakened that morning and heard two pistol shots; that they got up and looked out of the window and saw a man running away, apparently from the Bjorkman lot, without hat, coat or vest on, looking back as if he were frightened; that he went on toward Paulina street. And except also that a Miss Mulgaven, who lived above the premises occupied by Bergan, testified that she was awakened and went to the door and heard pistol shots, which appeared to her to come from the rear of the premises occupied by Bjorkman. The shots fired by the policemen came from the front of the lot, and if any shots were fired from the rear they must have been fired by some other person. There was a conflict in the evidence between the witnesses as to whether or not plaintiffs in error fired only four shots, as insisted on by them. There was testimony tending to prove that the marks of five bullets were found on the Bjorkman house and other buildings near,—some high up and others low down. There was some evidence tending to prove that one of the plaintiffs in error was intoxicated. It seems to have been established that Healy

had a contusion or bruise on the side of his head that Christmas morning. Proof of good character was also made on behalf of plaintiffs in error.

Other facts and circumstances were shown having some tendency to prove or to disprove the guilt of the plaintiffs in error, but the principal facts are as we have stated, and from them it sufficiently appears that the case was one requiring great care on the part of the court in its rulings during the progress of the trial and in instructing the jury as to the law of the case.

It is insisted by plaintiffs in error that the court erred also in giving to the jury, at the instance of the People, the following instructions:

"The court instructs the jury, in the language of the statute, if a person kill another in self-defense it must appear that the danger was so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm the killing of the other was absolutely necessary, and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given."

"Justifiable homicide is the killing of a human being in necessary self-defense, or in the defense of habitation, property or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a known felony, such as murder, rape, robbery, burglary and the like, upon either person or property, or against any person or persons who manifestly intend to endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein. A bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted

under the influence of those fears, and not in a spirit of revenge."

These instructions are mere transcripts of sections 148 and 149 of the Criminal Code, barring the mistake of using the phrase "manifestly intend *to* endeavor" for "manifestly intend *and* endeavor," and while otherwise correct as abstract propositions of law or as applicable where self-defense or justifiable homicide is relied upon as a defense to the indictment, were not only wholly inapplicable to the case at bar, but were calculated to lead the minds of the jury away from the defense as made, to another not attempted and in support of which no evidence whatever was offered. So far as the record shows it was not contended or even suggested by any one that the accused were justified under the provisions of the statute embodied in these instructions. Both defendants testified, and no inference can be drawn from their testimony that they claimed to act in their necessary self-defense, or in defense of habitation, property or person. The court instructed the jury as to the law involving the rights and duties of public officers in making arrests and in re-capturing escaping prisoners, as applicable to the case on trial, and upon other phases of the case, and in so doing was required to pass upon a great volume of instructions offered by counsel for the respective parties, and doubtless, in the pressure of the work thus imposed, gave the instructions mentioned to the jury through inadvertence. Upon what theory the State asked these instructions we are not informed. It has been held times without number that it is not error to refuse instructions which contain mere abstract propositions of law. It is also true that, as a general rule, it is not error to give them. (*Ryan* v. *Donnelly,* 71 Ill. 100; *Upstone* v *People,* 109 id. 169.) But instructions should be based upon the evidence. (*Coughlin* v. *People,* 18 Ill. 266; *Belk* v. *People,* 125 id. 584.) If they are not based upon the evidence, and also tend to mislead the jury to the injury of the party

against whom the verdict is rendered, the judgment will be reversed, although they are correct as abstract propositions. 11 Am. & Eng. Ency. of Law, 248; *Beaver* v. *Taylor*, 1 Wall. 637; *State* v. *Bailey*, 57 Mo. 131.

We are referred to *Upstone* v. *People, supra*, as holding that it is not error to give an instruction which states an abstract principle of law not applicable to the case, unless the principle stated is erroneous. The instruction there referred to is not set out in the report of the case, but it could not have been intended by what was there said to lay down any general rule, for it cannot be doubted that an abstract proposition of law correctly stated, but having no proper application to the case on trial, may be of such a character, when applied to the evidence before the jury, as to mislead them, and be instrumental in calling forth a verdict which would not otherwise be rendered. In the case at bar there was testimony which, if believed by the jury, showed that Nelson made a violent assault upon Healy and knocked him senseless down upon the street, but there was no evidence whatever that the shooting was done either to avoid this assault or in a spirit of revenge because of it. This evidence by and on behalf of plaintiffs in error tended to prove the lawfulness of the arrest, and that they were in discharge of their duty, as officers of the law, in attempting to re-capture the escaping prisoner, but had no bearing whatever upon any question of self-defense, and it was error for the court to give instructions the only effect of which would be to cause the jury to misapply this evidence,—that is, to take it from its proper relation to and bearing upon the defense as made, and apply it to another not attempted and not maintainable. As well said in *Thompson* v. *Shannon*, 9 Tex. 536: "The fair test of the propriety of a charge cannot be whether, in the abstract, it is right. It must be taken in view of the evidence of the facts charged on which the jury is to respond. A charge in the abstract, as a mere legal proposition,

might be perfectly inoperative and harmless, when, however, referred to a certain set of facts and circumstances in the proof it might have a most important and conclusive influence on the jury in forming their verdict."

There was much in these instructions, coming from the court to a jury unlearned in the law and unfamiliar with legal phraseology, calculated to prejudice in their minds the defense of plaintiffs in error. One of them told the jury, among other irrelevant things, that "a bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge." Who can tell what the jury understood was meant by this part of the charge of the court? It cannot be supposed that they would not rely upon these instructions as having some important bearing upon the case. If we could see that, whether relied upon or not, they could have produced no injury, then it would follow that the error was harmless. But it cannot reasonably be said that the accused were not prejudiced. On the contrary, in view of the defense made, we think these instructions, although given as copies of the statute, were calculated to mislead the jury to the injury of the defendants on trial for so grave a charge.

As before pointed out, there was evidence properly given and before the jury tending to impeach the witness Saeler, and the court was asked by plaintiffs in error to give to the jury the following instruction:

"The court instructs the jury that the credibility of a witness may be impeached by proof that he or she has made a statement or statements out of court contrary to the testimony given by such witness on the trial. If the jury believe, from the evidence, that any witness who has testified in this case has made a statement or state-

163—25

ments, upon a material fact in the case, out of court, contrary to the statements made by such witness upon the trial, then the contradictory statements would tend to impeach such witness, and you would be justified in rejecting the testimony of such witness if, from all the evidence, you believe it to be untrue."

The writer of this opinion is unable to see any valid objection to this instruction, and is of the opinion that it should have been given. But this view is not concurred in by a majority of the court. It seems to the writer that as this instruction was applicable to the case, and as no other instruction was given covering the same ground, plaintiffs in error were entitled to have the jury instructed on this phase of the case, and that it was error to refuse this instruction.

Counsel for the People cite *Evans* v. *George*, 80 Ill. 51, and contend that this instruction is erroneous and was properly refused, "inasmuch," to use their language, "as it would have given the jury the power to absolutely reject *all* the testimony of a witness who might have made former contradictory statements, whether any portion of it had been corroborated or not." The instruction is not, in the opinion of the writer, subject to this criticism, but is saved therefrom by its last clause, viz.: "If, from all the evidence, you believe it to be untrue." The testimony of an impeached witness may be corroborated, but false testimony cannot be corroborated by any credible evidence in the case, and if, from all the evidence, the jury should believe the testimony in question to be untrue, no room was left for corroboration.

Without passing on other objections urged by plaintiffs in error the judgment will be reversed and the cause remanded. *Reversed and remanded.*